**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ESTATE OF ALMIRA MARIE WILL, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No.: 11-cv-5482** |
| | : | |
| **NESHAMINY MANOR, INC., et al.,** | : | |
| **Defendants.** | : | |

<u>**M E M O R A N D U M**</u>

**SITARSKI, M.J.**                                                    **March 21, 2013**

Currently pending before the Court is a motion for summary judgment filed by

Defendants Neshaminy Manor Long Term Care Facility and Neshaminy Manor, Inc.  For the

following reasons, the motion will **GRANTED**.


**I.      INTRODUCTION**

Plaintiffs filed their Complaint on August 31, 2011, against Neshaminy Manor Long

Term Care Facility and Neshaminy Manor, Inc.  This matter initially was assigned to District

Court Judge Juan R. Sanchez.  On October 4, 2012, the parties consented to the exercise of

jurisdiction by a United States Magistrate Judge under 28 U.S.C. 636(c) and Fed.R.Civ.P. 73,

and the matter was referred to me.  (Doc. No. 70).

The parties have engaged in motion practice, pleading amendments, and stipulations

between the parties.[1]   As a result, the claims remaining in this matter are those currently pending

_____

[1]   On October 26, 2011 Defendants filed a motion to dismiss for failure to prosecute.
(Doc. No. 10).  On February 7, 2012 the Judge Sanchez entered an order denying the motion to
dismiss.  (Doc. No. 18).  On March 9, 2012, Plaintiffs filed an Amended Complaint, adding

against Neshaminy Manor Long Term Care Facility and Neshaminy Manor, Inc. Those claims are: violations pursuant to 42 U.S.C. §1983 for deprivation of civil rights under the Federal Nursing Home Reform Amendments ("FNHRA") (Count I), derivative claims for wrongful death and survival under the FNHRA (Counts II and III), and a state law breach of contract claim (Count IV).

On July 30, 2012, following completion of discovery, Defendants filed the instant Motion for Summary Judgment along with a Statement of Undisputed Material Facts. (Doc. No.'s 48, 49). On August 13, 2012, Plaintiffs filed a Response and a Counter-Statement of Undisputed Material Facts. (Doc. No. 50); *see also* (Doc. No.'s 51-55). On August 17, 2012, Plaintiffs filed an amended brief in support of their Response. (Doc. No. 56). On August 20, 2012, Defendants filed a Reply. (Doc. No. 57). Accordingly, the matter is now ripe for disposition.

## II.    FACTUAL BACKGROUND[2]

### A.    The Parties

The plaintiffs are the Estate of Almira Marie Will ("Ms. Will"), by and through Lauretta M. Notwick ("Ms. Notwick"), Executrix of the Estate, and Lauretta M. Notwick, individually

---

Genesis Eldercare Network Services, Inc. as a Defendant. (Doc. No. 26). On April 11, 2012, Neshaminy Manor Long Term Care Facility and Neshaminy Manor, Inc. filed an Answer. (Doc. No. 35). On April 16, 2012, Genesis Eldercare Network Services, Inc. filed an Answer. (Doc. No. 45). On July 2, 2012, all Parties filed a Stipulation of Voluntary Dismissal dismissing Genesis Eldercare Network Services, Inc. (Doc. No. 45).

[2] The following facts are either undisputed, or are taken in the light most favorable to Plaintiffs, the non-moving party.

(collectively "Plaintiffs"). Ms. Will passed away on June 5, 2010. From August, 2008 until her death in June, 2010, Ms. Will had been a resident at Neshaminy Manor Long Term Care. Kozlowski Dep. at 23. Neshaminy Manor Long Term Care is a nursing home and one of the named defendants in the instant dispute. Ms. Notwick is the daughter of Ms. Will and also is the executrix of Ms. Will's estate.[3]

The defendants are Neshaminy Manor, Inc. And Neshaminy Manor Long Term Care (collectively "Neshaminy" or "Defendants"). Neshaminy Manor Long Term Care is a nursing facility owned and operated by Bucks County, Pennsylvania. Neshaminy Manor, Inc. is a non-profit Pennsylvania corporation owned and operated by Bucks County. *See* Am. Compl. at ¶ 7.

### B. The operation and structure of Neshaminy.

Bucks County operates Neshaminy through its Board of Commissioners ("The Board"). *See* Kozlowski Dep. at 31. The Board entered into a "Management Agreement" with Genesis Eldercare Network Services, Inc. ("Genesis"), pursuant to which Genesis agreed to undertake various management responsibilities. *See* Pl. Resp., Ex. A (a copy of the "Management Agreement"). While Genesis was the manager of Neshaminy, the Board remained the ultimate decision-making authority under the express terms of the agreement. *Id.* at Art. 1.1, ¶ 1.1. The Management Agreement required Genesis to appoint an administrator to serve as a consultant for all of Neshaminy's operations. *Id.* Bucks County agreed to provide Genesis with any relevant County policies, and Genesis agreed to implement the policies and procedures that were necessary to run Neshaminy. *See id.* If Genesis wished to implement any of their own policies

---

[3] Prior to Ms. Will's death, Ms. Notwick was appointed Ms. Will's power of attorney. Notwick Dep. at 9.

or utilize any of their own manuals, they were required to furnish them to the Board for their review and approval. *Id.* at Art. 1, ¶ 1.16.

Genesis appointed Evelyn Kozlowski ("Ms. Kozlowski") as the administrator responsible for oversight of Neshaminy's operations. *See* Kozlowski Dep. at 30. Ms. Kozlowski testified that Neshaminy's nursing policies were developed by an "interdisciplinary team" who, in turn, furnished said policies to Ms. Kozlowski. Kozlowski Dep. at 21. Ms. Kozlowski reviewed the policies to ensure they complied with relevant laws and regulations, and then sent them back for final approval by the interdisciplinary team.[4] *Id.* The approved policies were passed along to Neshaminy's Director of Nursing, Wendy Trachtenberg, for implementation. *Id.* at 28-29. The responsibility for ensuring that the policies and procedures were followed rested with the employees of Neshaminy. *Id.* at 28.

The nursing staff at Neshaminy was responsible for a majority of the routine care provided at Neshaminy. Genesis made hiring recommendations for the nursing staff, but the staff remained employees of the County. *See* Seamans Dep. at 9. Ms. Kozlowski testified that Genesis did not have day-to-day interactions with the employees, nor did Genesis train or supervise the nursing staff.[5] Kozlowski Dep. at 26. If a resident made any type of complaint, the

---

[4] As noted above, the Board retained ultimate decision-making authority with respect to the operation of Neshaminy and was responsible for reviewing and approving any policies prior to their implementation by Genesis. See Pl. Resp., Ex. A at ¶¶ 1.1, 1.16.

[5] Under the Management Agreement, Genesis agreed to supervise and train the Neshaminy employees "according to the collective bargaining agreements governing facility employees..." Pl. Resp., Ex. A at ¶ 1.7. Ms. Kozlowski testified she was not aware of any employee training. Kozlowski Dep. at 26.

Neshaminy "routine" was to pass along the complaint to Ms. Kozlowski.[6]  *Id*. at 23.  Ms. Kozlowski testified that she did not "have any dealings in terms of handling complaints or concerns by [Ms. Will's] family."  *Id.* at 23.

In addition to hiring Genesis as a manager, Bucks County hired Dr. Moyer, an independent contractor, as the Neshaminy Medical Director.  See Def.'s St. of Undisp. Facts, Ex. 21 (a copy of the "Consulting Contract"); *see also* Moyer Dep. at 46.  As Medical Director, Dr. Moyer was responsible for supervising the care that Neshaminy's residents received.[7]  Moyer Dep. at 48-49.  Dr. Moyer was the attending physician for Ms. Will during the majority of her stay at Neshaminy.  *Id.* at 43, 58.

Bucks County also hired Wendy Trachtenberg ("Ms. Trachtenberg") as the Director of Nursing.  *see* Def. St. of Undisp. Facts, Ex. 19 (copy of the "Director of Nursing Job Description

---

[6] Ms. Kozlowski testified that only issues dealing with resident health, welfare, safety or regulatory compliance were routinely passed along to her.  Kozlowski Dep. at 22-23.

[7] At his deposition, Dr. Moyer described his duties as Medical Director as follows:

> Medical director of a long-term care facility, like Neshaminy Manor, is responsible for the supervision of the care patients in the entire facility, that is.  And that devolves really to supervision of patient care policies and – and to make sure that the policies are followed and that the care in the facility makes sense.  So I interact with the infection control person, with the director of nursing, with the-with the administrator.  So if there are any questions that come up that are sort of vaguely medical, if we have an outbreak of infectious disease, that falls under my responsibility.  If we have a difficult patient that is, a complex patient, that the nursing staff is concerned about, or the director of nursing is concerned about, I may be asked to review that record.  And I certainly review all the policies and procedures.  I attend quality assurance committee meetings on a regular basis, prepare the medical coverage schedule, make sure that it gets carried out." [sic]

Moyer Dep. at 48-49.

Policy"). Ms. Trachtenberg was responsible for the overall care of the residents, ensuring that Neshaminy followed state and federal regulations, and ensuring that the nurses complied with the Nursing Department Policy and Procedure Manual. Trachtenberg Dep. at 8-11.

Neshaminy was separated into six "units," containing either long-term or short-term residents.[8] Seamans Dep. at 20-21. Each member of the nursing staff was assigned to a particular unit. Donna Seamans ("Ms. Seamans") was the head nurse of "Unit A," where Ms. Will eventually resided. Ms. Seamans had general nursing duties and was the supervisor of the other nurses in her unit.[9] Seamans Dep. at 24. Neshaminy also employed a social worker, Elizabeth Doerr, who provided support to residents and their families. Doerr Dep. at 7-8.

### C. Ms. Will's stay at Neshaminy.

#### 1. Ms. Will is admitted to Neshaminy.

Beginning in 2005, Ms. Will began living with her daughter, Ms. Notwick. In 2006, Ms. Will was diagnosed with end-stage oxygen-dependent chronic obstructive pulmonary disease ("COPD").[10] Notwick Dep. at 46. On August 5, 2008, Ms. Will fell at a supermarket, and was treated for a broken hip at Doylestown Hospital. On August 18, 2008, Ms. Will was admitted to

---

[8] The six Units were labeled A-1, A-Ground, A-2, C-1, C-2, and D-1. Seamans Dep. at 20. D-1 was for Alzheimer's residents, C-1 was a short-term rehabilitation unit where Ms. Will was originally assigned. The other four units were all classified as long-term units.

[9] General nursing duties at Neshaminy included feeding residents, taking them to the bathroom, transferring them physically from one location to another, walking with them, and spending time with them. *See* Seamans Dep. at 38-39.

[10] COPD is "a serious lung disease that over time, makes it hard to breathe ... In people who have COPD, the airways–tubes that carry air in and out of your lungs–are partially blocked, which makes it hard to get air in and out." National Heart, Lung, and Blood Institute, available at: http://www.nhlbi.nih.gov/health/public/lung/copd/what-is-copd/index.htm (last visited 3/6/2013).

Neshaminy Manor as a short-term resident while she recovered from her hip injury.

Prior to her admission, Ms. Will had been treated with oxygen for her COPD; she had received oxygen twenty four hours a day since her 2006 COPD diagnosis.[11] Notwick Dep. at 46-47. Additionally, Ms. Will had a history of the following serious health conditions and treatments at the time of her admission: atherosclerotic cardiovascular disease with hypertension and paroxysmal atrial fibrillation, osteoarthrosis, hypothyroidism, carotid artery stent, postinflammatory pulmonary fibrosis, unspecified anemia, gastrointestinal bleeding, colon carcinoma, spinal stenosis, restless leg syndrome and some memory loss. Am. Compl. at ¶ 18; *see also* Notwick Dep. at 103-108. As noted above, Dr. Moyer became responsible for Ms. Will's care when she was admitted to Neshaminy.

## 2. Issues during Ms. Will's stay at Neshaminy.

Dr. Moyer originally ordered that Ms. Will be given "oxygen as needed." Moyer Dep. at 63. Two days after she was admitted to Neshaminy, Ms. Notwick found Ms. Will without oxygen and complained about the "as needed" aspect of the oxygen order. Pl. Resp., Ex. M (Ms. Notwick's "Neshaminy Manor Chronology"). In response, Dr. Moyer changed the order to provide for "continuous oxygen." Moyer Dep. at 65. Nevertheless, Ms. Notwick found her mother's oxygen tank turned off when she visited her on August 24 and 25, 2008.

According to Plaintiffs, similar "oxygen problems" continued throughout Ms. Will's stay

_____

[11] "Oxygen treatment increases the amount of oxygen that flows into your lungs and bloodstream. If your COPD is very bad and your blood oxygen levels are low, getting more oxygen can help you breathe better and live longer. There are several ways to deliver the oxygen, including: oxygen concentrators, oxygen-gas cylinders, and liquid-oxygen devices. You don't have to stay at home or in a hospital to use oxygen. Oxygen systems are portable. You can use them while you do your daily tasks." WebMD, available at: http://www.webmd.com/lung/copd/oxygen-treatment-for-chronic-obstructive-pulmonary-disease-copd (last visited: 3/6/2013).

at Neshaminy. Ms. Notwick testified that she often found Ms. Will's oxygen tank empty or turned off when she visited, which was generally about twice a week. Notwick Dep at. 65. Due to the ongoing oxygen problems, Ms. Notwick bought a "pulsometer," which is a device to check blood-oxygen levels. Ms. Notwick testified that on several occasions Ms. Will had very low blood-oxygen levels. *See id.*

On February 25, 2009, Ms. Will saw Dr. Stanford Gittlen, a pulmonologist. Pl. Resp., Ex. M. Dr. Gittlen noted that Ms. Will needed to be on oxygen twenty four hours a day.[12] *See id.* On April 19, 2009, Ms. Will was admitted to Doylestown Hospital, and was diagnosed with pneumonia and acute respiratory failure with hypoxia superimposed on chronic hypoxic respiratory failure. Def.'s St. of Undisp. Facts, Ex. 8.

On May 6, 2009, Ms. Notwick complained to Dr. Moyer and two other Neshaminy employees about the ongoing problems with her mother's oxygen. Pl. Resp., Ex. M. Ms. Notwick was assured that her mother's oxygen would be checked regularly. *Id.* Nevertheless, two days later Ms. Notwick visited her mother to find the oxygen tank empty. *Id.* On May 15, 2009, Ms. Notwick spoke to the nursing supervisor of Unit C (where Ms. Will was residing) about the oxygen problems. Ms. Notwick testified that the supervisor assured her that a staff meeting would be held to address the issue, but also added that the cost of oxygen and a resident's insurance needed to be considered in providing oxygen treatment. Notwick Dep. at 60-61. That same day, Dr. Moyer entered an order mandating that Ms. Will's oxygen tank be checked every two hours during the day shifts "to assure that oxygen is running." Def.'s St. of

_____

[12] Dr. Gittlen specifically noted that Ms. Will had dyspnea, interstitial fibrosis, a severe reduction in diffusing capacity, and severe emphysema. Def.'s St. of Undisp. Facts, Ex. 8 at NM000532-NM000533.

Undisp. Facts, Ex. 8 at NM000385, NM001131.

On May 18, 2009, Ms. Will's residency status was changed to long-term and she was transferred from Unit C-1 to Unit A-1.[13] She was evaluated at the time of her transfer, and diagnosed with unspecified anemia, dementia due to conditions classified elsewhere, Alzheimer's disease, unspecified glaucoma, primary open-angle glaucoma, and hypertension. Def.'s St. of Undisp. Facts, Ex. 8 at NM000799. Also on May 18, 2009, Ms. Will's Plan of care was updated; the nurses caring for Ms Will were instructed to: (1) position Ms. Will in such a way as to facilitate breathing and comfort; (2) administer oxygen to Ms. Will in compliance with the current orders; and (3) help Ms. Will use any respiratory devices necessary to administer oxygen. *Id.* at NM000801. During her stay in Unit A-1, Ms. Will's oxygen was removed when she was bathed, her clothes were changed, or she was toileted.[14] Seamans Dep. at 55-58. Ms. Notwick testified that this sometimes left her mother without her oxygen for half an hour.[15] Notwick Dep. at 66. Ms. Seamans was aware that Ms. Will was oxygen dependent, and that Dr. Moyer's order called for "continuous oxygen." Seamans Dep. At 56.

---

[13] Unit C-1 was a short-term unit while Unit A-1 was a long-term unit. The head nurse of Unit A-1 was Donna Seamans. Ms. Seamans testified that Ms. Will was transferred to Unit A-1 because her residency status had changed to long-term. Seamans Dep. at 44-45. Ms. Notwick testified that she did not feel that her house could accommodate Ms. Will and that was the reason she switched Ms. Will's residency status.

[14] Ms. Will received oxygen through a "nasal cannula," and this was removed by the nursing assistants to accomplish "dressing duties." Seamans Dep. at 56. "A nasal cannula is a thin, plastic tube that delivers oxygen directly into the nose through two small prongs. It's used in adult and pediatric patients alike as a type of respiratory support." About.com, available at: http://preemies.about.com/od/glossaryinthenicu/g/NasalCannula.htm (last visited 3/6/2013).

[15] Ms. Seamans testified that the process usually only lasted around five minutes, but she was not present every time the nursing assistants attempted to bathe or dress Almira.

### 3.    Ms. Will falls 5 times in 2010 leading up to her death.

On January 22, 2010, Ms. Will experienced her first fall at Neshaminy.  Shortly after

lunch, she fell out of her wheelchair, sustaining minor bruising that did not require

hospitalization.  Am. Compl. ¶33.  Consequently, Ms. Will's plan of care was updated to offer

her an afternoon nap in her bed.[16]  *Id.*  In the days after the fall, Ms. Will complained of pain and

stiffness in her knees, and made several requests for staff assistance.   Def.'s St. of Undisp. Facts,

Ex. 8 at NM000913.

In February 2010, Ms. Will fell twice.  Seamans Dep. at 78.  On February 24, 2010, Ms.

Will fell forward, out of her wheelchair.  After this fall, Neshaminy staff members performed a

"fall investigation," and a notation was made on Ms. Will's plan of care.  *See* Def.'s St. of

Undisp. Facts, Ex.  8.  On February 27, 2010, Ms. Will fell out of her wheelchair for the third

time, causing her knee pain and bruising on her forehead.  Am. Compl. ¶37.  As a precautionary

measure, Ms. Will was transferred to Doylestown Hospital, where her knees were x-rayed.

Def.'s St. of Undisp. Facts, Ex. 8 at NM000917.

On March 1, 2010, Neshaminy had an interdisciplinary meeting with members of the

nursing staff, administration, therapists and social workers to review Ms. Will's two February

falls.  Seamans Dep. at 81.  Ms. Will's plan of care was revised to install a seatbelt on Ms. Will's

wheelchair, and the staff was ordered to check on Ms. Will every 15 minutes from 3:00 to 5:00

---

[16]  As discussed further below, Ms. Will fell five times in total.  Ms. Seamans testified
that Ms. Will's plan of care was changed as a consequence of every fall.  Seamans Dep. at 76-77
Plaintiffs do not dispute that the plans of care were changed, but argue that these orders were not
carried out and were not sufficient responses to the falls.  Pl. St. of Facts at ¶40.  In a related
argument, Plaintiffs argue that more aggressive fall prevention measures should have been
instituted.  *Id.*

p.m.  *See* Def.'s St. of Undisp. Facts, Ex. 8 at NM0001943.  On March 8, 2010, the interdisciplinary team removed the 15 minute safety checks because Ms. Will had not fallen since the March 1, 2010 meeting.  *Id.*

On April 20, 2010, Ms. Will fell while trying to transfer herself from her bed to her wheelchair.  Am. Compl. ¶40; *see also* Seamans Dep. at 82.  Ms. Will sustained a fractured hip and was admitted to Doylestown Hospital, where she had surgery to repair the fracture.  Def.'s St. of Undisp. Facts, Ex. 8 at NM000749.  Neshaminy filed an Event Report with the Pennsylvania Department of Health.[17]  See Def.'s St. of Undisp. Facts, Ex. 24 (Neshaminy Event Report).

On April 30, 2010, Ms. Will returned to Neshaminy, but her health continued to deteriorate.  Her blood oxygen levels were often low, and she was given a "re-breather mask" in an effort to return her blood oxygen levels to normal.[18]

On May 17, 2010, Ms. Seamans discussed Ms. Will's declining health with Ms. Notwick, and informed her that the hip fracture sustained during the April 20, 2010 fall was a "major insult" to Ms. Will's body.  Def.'s St. of Undisp. Facts, Ex. 8 at NM000942.  She also gave Ms. Notwick information on hospice care, but Ms. Notwick reiterated her desire to continue

---

[17]  The record does not contain evidence that Neshaminy filed similar reports for Ms. Will's prior falls.  In response to the April 20th fall, an interdisciplinary team met and determined that Ms. Will had not followed her toileting plan, which ordered that Ms. Will be assisted whenever she needed to go to the bathroom.  To avoid a similar event happening in the future, Ms. Will's plan of care was revised so that her wheelchair was kept out of her room.  Def. Mot, Ex. 8 at NM000823.  Additionally, a bed alarm was applied to her bed to alert staff when Ms. Will attempted to get out of her bed.  *See id.*

[18]  A rebreather mask is used "to deliver high amounts of oxygen to people during emergency situations."  Ehow, available at: http://www.ehow.com/facts_6084936_rebreather-vs_-non_rebreather-mask.html (last visited 3/6/2013).

giving aggressive care to Ms. Will.

On May 28, 2010, Ms. Notwick agreed to put her mother under hospice care at Compassionate Care Hospice. Def.'s St. of Undisp. Facts, Ex. 18 (Compassionate Care Hospice Agreement and Assessment); *see also* Seaman Dep. at 89. Ms. Notwick testified that she agreed to hospice care only because she felt that Neshaminy could not keep her mother safe. Notwick Dep. at 86. Compassionate Care Hospice was a separate entity from Neshaminy which provided hospice services for people at their residences; thus, Ms. Will did not leave Neshaminy when she began receiving hospice care. Seaman Dep. at 89-90.

On May 31, 2010, Ms. Will fell out of her bed, sustaining a minor injury to her right knee. In response, Ms. Will's plan of care was updated to give Ms. Will a low bed, and a thin mat was added on the floor on the right side of Ms. Will's bed. Def. St. of Undisp. Facts, Ex. 8 at NM000837, NM4020-NM004026.

On June 1, 2010, Ms. Notwick arrived at Neshaminy to find Ms. Will with a large lump on her neck. Consequently, Ms. Notwick discontinued hospice care and informed Dr. Moyer that she wanted Ms. Will taken to Doylestown Hospital. Pl. Mot., Ex. M. Dr. Moyer and Ms. Notwick then argued over how Ms. Will's care should proceed. Dr. Moyer yelled at Ms. Notwick for continuing to pursue aggressive care for her mother because she was "actively dying." When Ms. Notwick insisted that Ms. Will be transported to the hospital, Dr. Moyer removed himself from Ms. Will's care.[19] Moyer Dep. at 106-109.

---

[19] Dr. Moyer testified that the June 1, 2010 confrontation arose because it was his belief that nothing could be done medically to improve Ms. Will's outcome. Moyer Dep. at 106-107 He felt that Ms. Will needed comfort measures in the familiar environment of Neshaminy, rather than aggressive care at the hospital. *Id.*

Upon admission to Doylestown Hospital, Ms. Will was diagnosed with right upper lobe pneumonia, end-stage COPD, left parotid gland infection, chronic kidney disease, dehydration, severe dementia, macrocytosis, and hyponatremia.[20]  *See* Def Mot., Ex. 12 at BCMA 006-008.

On June 2, Dr. Myers (who replaced Dr. Moyer) stated that Ms. Will had significant pneumonia in her right lung.  Dr. Sean Smullen, an ear, nose and throat doctor also examined Ms. Will, and diagnosed Ms. Will with a significant salivary gland infection, which was the cause of the lump on Ms. Will's neck.

On June 5, 2010 Ms. Will died at Doylestown Hospital.  Am. Compl. ¶ 45.  According to Ms. Will's death certificate, the cause of her death was "respiratory failure due to or as a consequence of pneumonia due to or as a consequence of chronic lung disease with chronic hypoxia.  Def.'s St. of Undisp. Facts, Ex. 13 (a copy of Almira Marie Will Death Certificate, P-0026).  The staph infection of the salivary gland was also a cause of death, although it was not listed on the death certificate.[21]  Notwick Dep. at 100-101; *see also* Pl. Mot., Ex. M (June 5 entry).

Following Ms. Will's death, Ms. Notwick filed a complaint against Neshaminy with the Pennsylvania Department of Health.[22]  Notwick Dep. at 78.  In response, on July 28, 2010, the

---

[20]  A pulmonary consultant examined Ms. Will and diagnosed her with respiratory failure-acute, secondary to extensive right-sided pneumonia nosocomial/nursing home acquired."  Def.'s St. of Undisp. Facts, Ex. 12 at BCMA 006-008.

[21]  Plaintiff argues that the staph infection of the salivary gland was a cause of death, and for purposes of this motion, we will credit this assertion.

[22]  The Pennsylvania Department of Health regulates and monitors nursing facilities such as Neshaminy, and requires a minimum of 2.7 hours of direct resident care for each resident per day.  *See Commonwealth of Pennsylvania*, Chapter 20, Long Term Care Nursing Facilities Regulations, July 2009, at Nursing Services- §211.12(f)(I).  Since Neshaminy exceeded this

Pennsylvania Department of Health and Human Services made an unannounced visit to Neshaminy to investigate Ms. Notwick's complaint, and determined that the complaint was unsubstantiated. Def.'s St. of Undisp. Facts, Ex. 14 (August 3, 2010 Dpt. of Health Letter).

## III. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party. *Id.* It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) *(citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party

---

minimum, Ms. Notwick's complaint was determined to be unsubstantiated.

carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.


IV.     **DISCUSSION**

Plaintiffs bring the instant suit under 42 U.S.C. §1983 for alleged violations of the Federal Nursing Home Reform Amendments ("FNHRA"). Defendants argue that summary judgment should be granted in their favor because Plaintiffs cannot establish municipal liability under the framework set forth in *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978).

 Section 1983 provides remedies for rights already existing in the Constitution or other federal statutes. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Pursuant to the FNHRA, nursing homes must provide a basic level of service and care for residents. *See Grammar v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 529 (3d Cir. 2009). The Third Circuit has held that a municipality or county can be sued under §1983 for violations of the

FNHRA. *See id.* at 522 (holding that the FNHRA conferred substantive rights on county nursing home resident enforceable under §1983).[23]

In order to state a claim for relief pursuant to §1983, "a plaintiff must demonstrate the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). "A municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). However, municipalities can be liable under § 1983 when "actions pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Id*. "[W]here . . . the action that is alleged to be unconstitutional implements or executes a policy statement, regulation, or decision officially adopted and promulgated by that body's officers," municipalities can be sued directly under § 1983. *Id*. at 690. Municipalities can also face liability under § 1983 "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id*. at 690-91. A "custom" arises from practices engaged in by state officials that are entrenched behavior in the municipal employees. *Id*. at 691.

A plaintiff must "present scienter-like evidence of indifference on part of a particular policymaker or policymakers." *Simmons v. City of Phila.*, 947 F.2d 1042, 1060-61 (3d Cir. 1991). "The requirement of producing scienter-like evidence on the part of an official with

---

[23] Both parties agree that Neshaminy was owned and operated by Bucks County. *See* Pl. Am. Br. at 11; *see also* Def.'s Undisp. St. of Facts, Ex. A at Art. 1, § 1.1. Consequently, the requirements for municipal liability must be met.

policymaking authority is consistent with the conclusion that 'absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom or failure to train.'" *Beswick v. City of Philadelphia*, 185 F.Supp. 2d 418, 427 (E.D. Pa. 2001) (*quoting Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991)).

In sum, "[t]o establish municipal liability under *Monell*, a plaintiff must identify the challenged policy, [practice, or custom,] attribute it to the [municipality] itself, and show a causal link between the execution of the policy, [practice, or custom,] and the injury suffered." *Beswick*, 185 F.Supp. 2d at 427 (internal quotation omitted).

Plaintiffs contend that Ms. Will's rights were violated because: (1) she was deprived of oxygen on numerous occasions; and (2) Neshaminy failed to institute sufficient fall prevention measures. Defendants argue that, even if this is so, Plaintiffs have not produced sufficient evidence that Neshaminy had a policy or custom of deprive its residents of oxygen, or insufficiently protect them from falling. Defendants also argue that Plaintiffs have not proven that the actions of Neshaminy's employees were taken pursuant to such any such policy or custom.

This Court will address whether Plaintiffs satisfy *Monell*'s requirements for municipal liability without first determining whether an underlying FNHRA claim could be sustained.[24] *See Jett v. Dallas Independent School District*, 491 U.S. 701, 711 (1989) (carrying out *Monell*

---

[24] Defendants dispute that they violated the FNHRA but note this issue is "likely an area of disputed fact," and thus inappropriate for summary judgment. *See* Def. Br. at 5. This Court agrees that there are disputed facts regarding the underlying FNHRA violations and, taking said facts in the light most favorable to Plaintiff, will proceed as if Plaintiff can sustain such clams.

analysis on assumption that rights were violated); *see also Oaks v. City of Philadelphia*, 59 Fed. Appx. 502, 503 (3d Cir. 2003) ("we will subject [Plaintiff]'s claim to a *Monell* analysis without first determining whether an actual 1981 claim could be sustained ...").

The starting point for a *Monell* analysis requires this Court to identify the relevant policymaker. *See Andrews v. City of Philadelphia*, 895 F.2d 1498, 1480 (3d Cir. 1990) (noting that the plaintiff must show the *policymaker* is responsible either for the policy or, through acquiescence, for the custom). Identifying the policy-making official is a question of law for the courts to decide, not a matter of fact to be submitted to the jury. *Albright v. City of Philadelphia*, 399 F. Supp. 2d 575, 593 (E.D. Pa. 2005) (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). In this instance, Plaintiff asserts, and this Court agrees, that the Bucks County Board of Commissioners is the relevant policy-maker. *See* Pl. Am. Br. at 11. The Board retained ultimate decision-making authority as to the facility's operations and had the authority to review any policies or practices that were implemented at Neshaminy. *See* Def.'s St. of Undisp. Facts, Ex. A at Art. 1, § 1.1 (a copy of the Management Agreement).

A.      **Plaintiffs claims based on oxygen problems.**

The record contains the following Neshaminy policies and procedures relevant to oxygen levels: (1) Care and Use of Respiratory Equipment; (2) Policies regarding taking and measuring patient's vital signs; and (3) the Oxygen Policy. *See* Def.'s St. of Undisp. Facts, Ex. 22b. Plaintiffs argue that Neshaminy's Oxygen Policy deprived Ms. Will of her federally-protected right to adequate care because it failed to base the provision of oxygen upon the residents need. Pl. Am. Br. at 12-13. Plaintiffs focus on the portion of the oxygen policy that states "the staff *may* replace portable E size cylinder if the needle is halfway in the red [refill] section." Plaintiffs

18

argue that the discretionary policy in place for refilling oxygen tanks (as opposed to a policy mandating refill) is deficient. They also argue that the policy was fiscally driven, citing the statement of a nurse who indicated that the high cost of oxygen needed to be taken into account when providing oxygen treatment.

Pursuant to doctor's orders, Ms. Will was to be provided with continuous oxygen. Plaintiffs have produced evidence showing a number of instances where Ms. Will was found with an empty oxygen tank, or with an oxygen tank that was not actually turned on. However, Plaintiffs have not produced any evidence that the discretionary nature of the oxygen policy led to these events. Plaintiffs have presented no evidence that Neshaminy's nursing staff consciously chose to exercise the discretion afforded to them under the oxygen policy, and thus failed to refill the oxygen tanks pursuant to the Oxygen Policy.

More importantly to this *Monell* analysis, Plaintiffs have adduced no evidence that the discretionary nature of the Oxygen Policy rendered the policy deficient. Neither of Plaintiffs' experts opine that the Oxygen Policy was deficient in some manner. Indeed, neither expert makes any mention whatsoever of the Oxygen Policy. *Cf. Foster v. City of Philadelphia*, 2004 U.S. Dist. LEXIS 1302 (E.D. Pa. Jan. 30, 2004) (finding issue of fact to survive summary judgment from expert opinion that training policy was deficient and below the national standard). Indeed, both reports opine that the Administrator and nursing staff were the cause of the oxygen problems, and neither report suggests that these failures resulted from actions taken pursuant to a Board policy.[25]  *See* Pl. Resp., Ex. G (copy of Stefanacci expert report); Ex. I (copy of Fowler

_____

[25]  To the contrary, both reports opine that it was the employees failure to follow orders and procedures that led to the oxygen issues. *See* Pl. Resp., Ex.'s G, I. Indeed, neither report takes issue, at all, with the discretionary nature of the Oxygen policy. Both reports focus

expert report).  As noted above, it is well settled that a municipality will not be held vicariously liable for the torts of its employees.  *See Monell*, 436 U.S. at 691.

Additionally, the mere fact that the Oxygen Policy was discretionary does not satisfy the principles of *Monell*.  In *Kranson v. Valley Crest Nursing Home*, the estate of a deceased resident brought suit against a nursing home because nursing home personnel did not administer CPR in order to try to save the deceased's life.  755 F.2d 46, 48-49 (3d Cir. 1985).  The deceased's daughter asserted that her father's rights were violated by the nursing home's policy that did not require CPR to be given based on the resident's need.  *Id.* at 49.  The policy mandated that CPR was <u>not</u> to be administered in every instance.  *Id.*  Instead, CPR was to be administered in compliance with certain guidelines.  *Id.*

The Third Circuit held that, even though the policy was discretionary, "the plaintiff failed to show the requisite causation between the defendant's policy and the alleged violation of constitutional rights."  *Id.* at 52.  The Court first noted that the *Kranson* policy, like the policy at issue here, was not an absolute prohibition against the administration of CPR.  *Id.*  The *Kranson* Court emphasized that causation requires a plaintiff to show that "the particular injury was incurred because of the *execution* of the policy."  *Id.* at 51 (*citing Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (emphasis added).  Thus, the fact that two nurses were unaware of

---

exclusively on the failings of individual medical personnel.  Dr. Stefanacci noted deviations from the standard of care, and noted failure, specifically, with respect to carrying out Doctors' orders on oxygen therapy.  *See* Ex. G at p.5.  Ms. Fowler also noted deviations from the standard of care, arising from the failure of staff to follow Doctors' orders.  Ms. Fowler notes that "assuring that an O2 tank is full, functioning, and providing the ordered amount of O2 is a nursing measure and does not require a physician's order."  *See* Ex. I at p.3.  As Ms. Fowler further notes, Ms. Will's pulmonary problems required "vigilant care," and the Doctors' orders directed that Ms. Will was to be provided oxygen continuously.  *See* Ex. I at p.5.  These opinions, that nursing care fell below the standard of care, are simply insufficient to impose municipal liability.

the policy and one nurse misinterpreted it was not sufficient to constitute "execution" of the policy. *Id.* at 51. Indeed, "the carelessness of an employee in failing to follow a policy or in misunderstandings it's meaning may establish negligence of the employee but does not fasten liability on the governmental agency." *Id*. Because the plaintiff failed to show that the failure to give CPR was done in execution or implementation of the CPR policy, the causation requirement of *Monell* had not been met, and the plaintiffs claim failed. *Id.*

Like in *Kranson*, the policy at issue here was not an absolute prohibition against refilling the oxygen tanks. Rather, the policy left the replacement of oxygen tanks to the discretion of the employees. Moreover, as in *Kranson*, there is no evidence that the nurses were executing any municipal policy when they failed to refill the oxygen tank.[26] *See id.; see also Tolbert v. Kelly*, 799 F.2d 62, 67 (3d Cir. 1986) (injury must occur as a result of the implementation of the program and faulty or unexplained failure to implement the policy does not establish the requisite causal nexus). Because Plaintiffs have not produced sufficient evidence that the Oxygen Policy was the "moving force" behind the nurses failure to refill the oxygen tank, Plaintiffs cannot maintain a *Monell* claim on the basis of Neshaminy's oxygen policy.

---

[26] Plaintiffs argue that the policy is deficient because it is "fiscally driven." In support, they point to the statement of nursing supervisor, Marybeth. Plaintiffs assert that Marybeth informed Ms. Notwick that "oxygen is very expensive, and that has to be considered as well as the insurance [Ms. Will] has." Pl. Resp., Ex. M. To begin, such off-handed comments from *one* non-policymaker are insufficient to support municipal liability, as it is always possible that one employee will be ill-informed, or mistaken, or simply incompetent. *See LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003) (statements by a non-policymaker are not considered to constitute county policy); *Kranson*, 755 F.2d at 51 (the policy, and not the subjective beliefs of those who implement it, are the focus for a *Monell* analysis). Indeed, an employees' misinterpretation or misunderstanding of a policy, which may constitute negligence, is not enough to sustain a *Monell* claim. *See id.* (*Monell* causation standard not met when employees misunderstood the relevant policy).

Plaintiffs also fail to establish a *Monell* claim on the basis of a County "custom." A municipality may be liable under a custom theory if it acquiesces to the custom. *See Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1980) (noting that custom liability requires evidence of knowledge and acquiescence). The only evidence Plaintiffs have produced relevant to the "customs" surrounding oxygen use at Neshaminy are the instances in which Ms. Notwick discovered Ms. Will's oxygen tank turned off or empty. Plaintiffs have not produced any evidence that the Board was made aware of these instances, or that the Board tacitly approved of, or authorized, such occurrences. *See e.g. Boemer v. Patterson*, 1987 U.S. Dist. LEXIS 6347 at *10 (E.D. Pa July 13, 1987) (finding no custom established because no evidence that defendants directed employees to refrain from taking necessary actions). Plaintiffs have not adduced any evidence of oxygen refill issues with other patients. *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980) ("[M]ere possibility of a constitutional deprivation is insufficient. Defendant must have been aware of actual deprivations in other instances."). Accordingly, Plaintiffs have not adduced evidence of a "custom" sufficient to sustain *Monell* liability.

In sum, Plaintiffs have not met the standards required to impose municipal liability, as established by *Monell* and its progeny. Taking the facts in the light most favorable to the Plaintiff, the record contains instances in which Ms. Will was found without an adequate and functioning oxygen supply. However, there simply is no evidence that would support the conclusion that these failures were caused by a municipal policy or custom. Accordingly, Plaintiffs cannot satisfy the rigorous requirements of *Monell* and it's progeny, and the claim against the County must fail.

**B.**      **Plaintiffs claims based on Ms. Will's falls.**

Plaintiffs claim that Neshaminy failed to "implement appropriate fall prevention measures in light of the resident's documented decline, numerous falls in a short period of time, and the family's expressed desire for aggressive care." Pl. Br. at 2. The record contains the following policies and procedures relevant to Ms. Will's falls: (1) Restraint Evaluation and Monitoring; (2) Alarm Devices-Bed/Chair; (3) Post-Fall Investigation Reports; (4) Call Bell Systems; and (5) Risk Alert Sheets. *See* Def.'s St. of Undisp. Facts, Ex. 22a.

Ms. Will fell five times in the last four months of her stay at Neshaminy. Plaintiffs claim that this was a result of the failure to implement fall prevention measures, and thus was a deprivation of Ms. Will's rights. In opposing Defendants' motion for summary judgment, Plaintiffs arguments focus almost entirely on why Ms. Will's rights were violated by the failure of the Neshaminy staff to implement and follow fall prevention orders. As discussed above, municipal liability will not be imposed on the basis of employees actions unless they were carrying out a county policy or custom. Plaintiffs do not point to any policy that was the "moving force" behind these failures. Plaintiffs argue that, prior to the first fall, the nursing supervisors became aware that the nursing staff was not following the medical orders, and thus they were deliberately indifferent to a known risk of future falls. This argument fails because, as set forth above, the nursing supervisors were not the "final decision-maker."[27]

---

[27] Acquiescence by the nursing supervisors to a custom of not complying with fall prevention measures will not suffice for *Monell* purposes. Plaintiffs note that the Unit Manager, the Director of Nursing and the nursing staff were all employees of Bucks County. Although their job duties included <u>implementing</u> protocols and standards of nursing, they were not the final decision makers; they were employees of the county and this Court does not find that these employee's acts represented official government policy. *See e.g. White v. Jefferson County*, 2010 U.S. Dist. LEXIS 133987 (W.D. Pa. Dec. 17, 2010) (even though warden had responsibility for

Plaintiffs also argue that there was a custom of "dismissive treatment of [Ms. Will's] family's concerns and wishes for aggressive medical care in favor of their preference to 'allow her the dignity to die peacefully.'" Pl. Br. at 13. Plaintiffs argue that the custom of dismissive treatment "...resulted in the failure to adhere to policies for documenting and reporting resident complaints concerning health, safety, and welfare, and failing to implement appropriate fall prevention measures in light of the resident's documented decline, numerous falls in a short period of time, and the family's expressed desire for aggressive care." *Id.* Plaintiffs also argue that the nursing staff failed to comply with a policy of notifying the Genesis administrator of the family's complaints, thereby preventing an interdisciplinary team was prevented from fixing the problems.

This Court first notes that any failure by the nursing staff to follow policies cannot support the imposition of municipal liability. *See Kranson*, 755 F.2d at 50-51 (carelessness of an employee in failing to follow a procedure may constitute negligence but does not fasten to the government). As for the custom of "dismissive treatment," Plaintiffs offer no evidence of other instances "dismissive treatment." More significantly, Plaintiffs offer no evidence that the Board was aware of this custom, and approved of, and ratified, it. *See Albright v. City of Philadelphia*, 399 F. Supp. 2d 575 (E.D. Pa. 2005) (finding no actionable custom when there was no evidence of practices beyond [defendants] behavior toward plaintiff herself). Accordingly, Plaintiffs cannot establish municipal liability based on an alleged custom of dismissive treatment.

---

establishing the jail's policies, he was not the final decisionmaker when such policies had to be reviewed by County Jail Board of Inspectors). There is no evidence that suggests that the ultimate decision making authority, the Board, was made aware of the nurses failures to comply with fall prevention measures.

## V. CONCLUSION

Plaintiffs have produced evidence that, if taken as true, would support an argument that Ms. Will's care was deficient in numerous ways. They also have produced evidence that might support an argument that the staff was often insensitive and unwilling to listen to the concerns of Ms. Will's family. However, we cannot ignore the fact that Neshaminy is a county-owned facility, and the requirements for municipal liability set forth in *Monell* must be met before liability can be imposed on the County. For the reasons set forth above, this Court finds that Plaintiffs have failed to meet the arduous requirements for imposing municipal liability.[28] Accordingly, Defendants' Motion for Summary Judgment is **GRANTED.**

An appropriate Order follows.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

---

[28] Plaintiffs also asserted a state law breach of contract claim in their Complaint. Defendants moved for summary judgment on this claim as well, but Plaintiffs did not address the claim in their Response. *See* (Doc. No.'s 50-56). Defendants motion as to this claim is therefore unopposed, and summary judgment will be granted. *See AMTRAK v. Pa. PUC,* 342 F.3d 242 (3d Cir. 2003) (where a party fails to adequately brief an issue the issue is waived) (internal citations omitted)